IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHARLES ERDMANN,

                                Plaintiff,                            OPINION AND ORDER

v.

                                                        19-cv-457-wmc

UNITED STATES OF AMERICA,

                                Defendant.

      *Pro se* plaintiff Charles Erdmann was incarcerated by the U.S. Bureau of Prisons ("BOP") at FCI-Oxford in 2017 when he suffered a shoulder injury, after which he contends a BOP physician, Dr. Robert King, acted negligently in treating that injury. Erdmann is proceeding in this lawsuit against the United States for King's negligence under 28 U.S.C. § 2679 of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et al*. In response, the United States now seeks summary judgment on the merits of Erdmann's claim (dkt. #42). Because the evidence of record shows that Dr. King's treatment did not fall below the applicable standard of care, the court will grant that motion and direct entry of final judgment in defendant's favor.

UNDISPUTED FACTS[1]

## A. Health Services at FCI-Oxford

      Inmates at FCI-Oxford can receive medical care from the Health Services Unit ("HSU"). In 2017, Dr. Paul Harvey was located at FCI-Milan in Michigan, but also served

---

[1] Unless otherwise noted, the following facts are material and undisputed for purposes of summary judgment.

as FCI-Oxford's "Acting Clinical Director."  In that role, Dr. Harvey co-signed treatment notes for non-independent providers such as registered nurses or licensed practical nurses or any care provided after hours.  Because FCI-Oxford did not have any specialty care physicians or orthopedic specialists, however, inmates that required treatment by a specialist were referred to providers in the community.

Dr. King also worked for the BOP as a family medical doctor from 2003 until he retired in 2019, providing medical services at different BOP facilities within his region, as assigned by Dr. Harvey.  In 2017, when Dr. King was assigned to FCI-Oxford, he typically traveled there on Monday, treated inmates from Tuesday through Thursday, and traveled home on Friday.  Dr. King had little control over his schedule at FCI-Oxford; rather, local HSU staff determined which patients Dr. King saw.  Similarly, when Dr. King was not working at FCI-Oxford, he would not review inmate records and did not know whether follow-up was needed unless local HSU staff contacted him directly or placed something in his record review queue.

### B. Erdmann's shoulder injury and treatment

On May 27, 2017, Erdmann injured his right shoulder while playing softball as an inmate at FCI-Oxford.  Erdmann went to the HSU, where a nurse consulted with Dr. Harvey over the phone, placed Erdmann in a shoulder sling, and arranged for Erdmann to be transported to the emergency room.  At the emergency room, a doctor ordered an x-ray, which showed no factures.  As reflected in the emergency doctor's discharge instructions at the time, she suspected that Erdmann had a rotator cuff injury.  Accordingly, she recommended orthopedics follow up and an MRI.  She also recommended that Erdmann

continue wearing a sling for his shoulder and alternate between acetaminophen and ibuprofen.  However, that doctor did not suggest any need for surgery, much less an urgent need.

A nurse also met with Erdmann the next day, then spoke with Dr. Harvey and placed orders for Erdmann for an orthopedic consult *and* for acetaminophen and ibuprofen. On June 6, Erdmann returned to the HSU and was seen by a nurse practitioner, who noted that Erdmann's orthopedic consult had been approved but was not yet scheduled.  The NP also renewed the order for acetaminophen and added an order for naproxen.

On June 15, Erdmann was first seen by Dr. King.  The purpose of that appointment was to address Erdmann's ongoing care for chronic anxiety, depression, and low back pain. At that time, Erdmann was still wearing his shoulder sling, but told Dr. King that he did not want him to examine his shoulder.  Dr. King then offered Erdmann duloxetine for his pain, which Erdmann also refused, prompting Dr. King to renew the orders for acetaminophen and naproxen.  Dr. King further noted that Erdmann was awaiting an MRI on his shoulder.  Dr. King explains that he did not provide any additional interventions because (1) Erdmann's needs were beyond his level of expertise, and (2) Erdmann had already been scheduled for an orthopedic specialist consult.

On June 26, 2017, Erdmann next saw Dr. Douglas Arnold, an orthopedic specialist. As had the emergency doctor, Dr. Arnold also suspected a rotator cuff injury and recommended an urgent MRI to determine the appropriate course of treatment.  Further, although Erdmann reported pain at an 8 out of 10, Dr. Arnold did not consider Erdmann to be in acute distress, nor did he prescribe painkillers or surgery at that time.

On July 5, 2017, Erdmann had an MRI of his shoulder done.  Dr. King met with Erdmann a week later, on the afternoon of July 12.  At that point, however, HSU staff had not yet received the MRI results back, so Dr. King could not review them.  Still, Dr. King asked HSU staff to get the results and about two hours later the MRI results were faxed to the HSU.  By that time, however, Dr. King had already left the institution for the day.  The imaging showed that Erdmann had a nondisplaced fracture of the greater tuberosity, a bone contusion, and a modest partial thickness rotator cuff tear.  The very next day, Dr. Harvey reviewed the MRI and placed an order for a follow-up orthopedic consult, which was consistent with Dr. Arnold's earlier recommendation.

Dr. King next met with Erdmann on August 10, and the two discussed the MRI results.  Dr. King also placed Erdmann in a shoulder immobilizer and renewed the acetaminophen and naproxen orders.  Then, on August 14, Erdmann had a follow-up appointment with Dr. Arnold.  After those two also reviewed the MRI, Dr. Arnold discussed treatment options, including physical therapy and a steroid injection, and Dr. Arnold provided a steroid injection.  However, Arnold still did *not* recommend surgery at that time.

Two days later, Erdmann was again seen in the HSU, and a pharmacist prescribed him duloxetine for pain.  The next day, Dr. Jason Clark met with Erdmann in the HSU, and he inserted a second steroid injection in Erdmann's shoulder to reduce pain and inflammation.  In addition, Dr. Clark provided Erdmann stretching and strengthening exercises and prescribed meloxicam for pain.  Next, on September 28, Erdmann met with a pharmacist and reported that the duloxetine provided some pain relief.

Dr. King did not meet with Erdmann again until October 5.  The purpose of that visit was to discuss Erdmann's sleep apnea, along with the results of an MRI that had been taken to address his lower back pain.  In particular, Erdmann reported that he had been taking duloxetine and meloxicam for his back and shoulder pain but wanted more and better pain relief.  At that point, Dr. King ordered a referral to an outside provider for pain management and a second opinion.

Dr. King saw Erdmann about a month later, on November 1, to review Erdmann's sleep study.  However, Erdmann reported that he would be moving soon to another institution, because his security level had decreased.  Dr. King responded that his transfer would delay any medical consults and offered to put Erdmann on a medical hold.  Because Erdmann preferred to move to a lower security facility, however, he declined Dr. King's offer.  Dr. King did not meet with Erdmann again before he was transferred out of FCI-Oxford around March 1, 2018.

### C.   Erdmann's subsequent treatment and rehabilitation

After his transfer, Erdmann was placed at two, different federal facilities, where he experienced continuing shoulder issues.  In July 2019, he was transferred to the BOP's Federal Medical Center in Butner, North Carolina ("FMC Butner").  FMC Butner's orthopedic staff first attempted non-surgical treatments on Erdmann, including physical therapy and steroid injections.

Unfortunately, these non-surgical options did not improve Erdmann's condition, and although the BOP's orthopedic surgeon Dr. Reginald Hall was skeptical about its

efficacy, he performed surgery to address Erdmann's shoulder pain on December 9, 2019. Dr. Hall found no clear structural issues that required repair.

After surgery and rehabilitation, orthopedic staff assessed Erdmann as having good shoulder function, with excellent strength and range of motion.  For example, a physical therapist and board-certified orthopedic specialist, Captain Damien Avery, observed Erdmann working as an orderly in January 2021.  Captain Avery observed that Erdmann did not appear to be in pain and that his movement was not limited.  Nonetheless, Erdmann continued to report pain.

Dr. Hall also attests that Erdmann's ongoing complaints presented a dilemma because his pain complaints were inconsistent with his level of function.  Dr. Hall next conducted an ultra-sound guided steroid injection, but it also did not alleviate Erdmann's pain.  He then referred Erdmann to an outside orthopedic surgeon for a second opinion as to the cause of his pain and an appropriate form of treatment.  While the outside surgeon recommended a steroid injection in Erdmann's neck, he or she was similarly unable to determine the source of Erdmann's pain.  Eventually, because staff determined that Erdmann had a functional shoulder, he was released from orthopedic care in 2021.

### D. Expert opinions

Erdmann did not submit expert evidence in support of his claim.  According to Dr. Hall, bone contusions and nondisplaced fractures typically heal on their own, become asymptomatic or get larger over time, as can partial rotator cuff tears.  Moreover, partial rotator cuff tears are typically treated first with non-surgical options.  To allow for healing to occur, Dr. Hall further attests that surgery for a partial rotator cuff tear is also indicated

6

only when shoulder function is compromised because of persistent pain after an adequate trial of physical therapy, medication, and the passage of time. Dr. Hall also explains that the timing of surgery depends on the shoulder's response to non-surgical treatment, the passage of time, and the size and type of tear, adding that if the rotator cuff tear is not complete, surgery is not urgent.

Moreover, according to Captain Avery, when a partial tear is accomplished by a non-displaced fracture, it is *necessary* to allow the fracture to heal before considering the need for invasive interventions like surgery. Avery explains that because surgeries carry risks, the orthopedic team at FMC Butner attempts to exhaust non-surgical options to allow the body to improve function without surgical intervention.

Finally, defendant's retained expert, Dr. Dean Ziegler, attests that Erdmann's treatment was appropriate and did not cause his alleged injuries.

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). At summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences

supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

The FTCA provides the exclusive remedy for certain individuals to recover damages caused by the negligent or wrongful act of a federal government employee. 28 U.S.C. §§ 2671-2680; *Levin v. United States*, 568 U.S. 503, 506-07 (2013). Because Erdmann was incarcerated at FCI-Oxford in Wisconsin during the relevant period, his negligence claim is governed by that state's law. 28 U.S.C. § 1346(b); *F.D.I.C. v. Meyer*, 510 U.S. 471, 477 (1994). To succeed on a negligence claim under Wisconsin law, a plaintiff must prove (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860 (2001). Wisconsin law defines medical negligence as the failure to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999).

Defendant seeks summary judgment because: (1) Erdmann has failed to submit expert evidence in support of his negligence claim; and (2) the evidence of record does not support a reasonable finding that Dr. King breached a duty of care. On this record, defendants are entitled to summary judgment as to both arguments.

First, Erdmann has not submitted expert evidence that Dr. King's treatment fell below the applicable standard of care for a family medicine physician. In Wisconsin, expert testimony is necessary to establish the applicable standard of care for medical malpractice *except* where a layperson could conclude, from common experience, that the plaintiff's injury would not have occurred if the provider had used proper care and skill. *Gil v. Reed*,

381 F.3d 649, 659 (7th Cir. 2004).  Here, Erdmann maintains that he did not need to submit expert testimony because it would have been obvious to Dr. King that his injury was sufficiently serious to require surgery, given that he could not access effective physical therapy at FCI-Oxford.  But he provides no authority for that proposition, and the question of whether a family medicine doctor should have recognized an immediate need for shoulder surgery -- without support from a specialist -- is not within the knowledge of a layperson or this court.  Therefore, Erdmann's claim fails absent expert evidence that Dr. King's care fell below the applicable standard of care.

As importantly, Erdmann's claim fails independently because no reasonable trier-of-fact could find that Dr. King breached the applicable standard of care even when viewing the evidence of record in a light most favorable to plaintiff.  In particular, there is *no* dispute that Dr. King's decisions must be viewed from his role as a family medicine doctor, since he is not an orthopedic specialist.  Plus, King attests that his treatment decisions were consistent with this standard of care, and defendant's expert attests that the overall management of Erdmann's shoulder -- not just Dr. King's treatment decision -- was appropriate.  Indeed, Dr. King examined Erdmann five times during the relevant period, and *none* of those encounters suggests that he failed to exercise the degree or care and skill exercised by an average family medicine practitioner.

Specifically, on June 15, Dr. King did not provide interventions beyond offering Erdmann duloxetine and renewing his medication orders because Erdmann was still waiting for his orthopedic consult and an MRI.  Further, *Erdmann* would not allow Dr. King to examine his shoulder.  Thus, no evidence of this interaction even suggests that Dr. King's

treatment fell below the standard of care.  Still, Erdmann maintains that Dr. King should have referred him for surgery from the start, contending that his shoulder injury was "atypical," *and* that surgery was ideal immediately for him because physical therapy by professionals were not available at FCI-Oxford, meaning that he was left with just pain medications to address his injury.  However, no reasonable trier of fact could agree that Dr. King was in any position to make this judgment call about the appropriate intervention at that point, given that:  Erdmann would not let him examine him; no imaging had been taken; and Erdmann had not yet seen an orthopedic specialist.  In any event, Erdmann does not submit any evidence suggesting that he presented to Dr. King that day with such a serious shoulder condition that it would have been obvious that an urgent order for surgery was warranted.

The result is the same as to their July 12 encounter, when the MRI results were not available for Dr. King to review.  Indeed, it is undisputed that Dr. King had already left the institution by the time these results were faxed to FCI-Oxford.  Erdmann argues that Dr. King should have waited for the MRI results and referred him for surgery that day, but no evidence of record suggests that it was necessary for Dr. King to review the results that day, much less that a referral for surgery was the appropriate next step.  Again, the record suggests the opposite:  the very next day, *Dr. Harvey* referred Erdmann back to Dr. Arnold for a follow-up discussion about the results of the MRI.

Likewise, when Dr. King next met with Erdmann on August 10, he did not ignore Erdmann's injury, but provided him a shoulder immobilizer, and they again discussed his shoulder.  Dr. King was in no position at that point to do anything more than provide

Erdmann the immobilizer and wait for his upcoming orthopedic consult.  Certainly, no reasonable jury would have a basis for finding a family medicine doctor like King should have placed orders for *any* additional interventions pending Erdmann's follow-up with a specialist, much less to order surgery.

Similarly, the follow-up a month later on August 14 does not suggest that Dr. King's approach fell below any reasonable standard of care, since as a specialist under a *higher* duty of care, Dr. Arnold did not believe the MRI results required surgery; instead, Arnold offered Erdmann a steroid injection and physical therapy.

Dr. King's two, final interactions with Erdmann did not even focus on his shoulder injury.  In October and November, Dr. King provided the medical care that was within his expertise:  he requested a consult for Erdmann's continuing complaints of pain and offered to request a medical hold for Erdmann's transfer to avoid delaying his pain management consultation.  Once again, these interactions do not provide a reasonable trier of fact any basis to conclude that Dr. King knew or should have known that Erdmann required surgery at that point and failed to make that specific request.

Tellingly, Erdmann does not engage with any of these specific interactions with Dr. King.  Instead, he appears to challenge whether the typical approach to treating a shoulder injury applied to him in the institutional setting because:  formal physical therapy sessions even not available; his medications merely numbed his pain; and engaging in self-directed physical therapy may have actually *worsened* his injury.  Yet, Dr. King did not recommend physical therapy; Dr. Arnold made that recommendation as a specialist, and no evidence suggests that Dr. King was in a position to overrule Dr. Arnold's recommendations or had

any basis to question whether physical therapy, steroid injections and pain medication were appropriate interventions.

Most importantly, Erdmann's theory is not grounded in any evidence: nothing in the record suggests that Erdmann actually engaged in physical therapy incorrectly, much less that his shoulder condition worsened as a result of him engaging in self-directed physical therapy exercises. In addition, when Erdmann eventually did undergo surgery, Dr. Hall observed no evidence of a persistent problem in the structure of his shoulder, and as defendant points out, *multiple* orthopedic surgeons subsequently could not identify the cause of Erdmann's continued problems. The fact that Erdmann continued to experience unexplained pain years later is *not* evidence that Dr. King negligently treated his injury in 2017. If anything, the fact that repeated, subsequent attempts at treatment by specialists suggests King's inability to do so as a generalist cannot be faulted. *See Myles v. Gupta*, No. 14-cv-661-bbc, 2016 WL 1629412, at *4 (W.D. Wis. Apr. 22, 2016) ("Under Wisconsin law, medical providers are not deemed negligence simply because their treatment decisions result in an adverse event.") (citations omitted); *Hudson v. United States*, 636 F. Supp. 2d 827, 831 (W.D. Wis. 2009), *aff'd*, 375 F. App'x 596 (7th Cir. 2010) (citing Wis. JI-Civil 1023 ("A doctor is not negligent, however, for failing to use the highest degree of care, skill, and judgment or solely because a bad result may have followed her care and treatment."). Accordingly, on this record, no reasonable jury could conclude that Dr. King breached a duty of care owed to Erdmann, and defendant is entitled to summary judgment.

ORDER

IT IS ORDERED that:

1)  Defendant's motion for summary judgment (dkt. #42) is GRANTED.

2)  The clerk of court is directed to enter final judgment in defendant's favor.

Entered this 2nd day of August, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge